J-S13039-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: K.L.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| APPEAL OF: M.H.B., JR., FATHER | : | |
| | : | |
| | : | No. 53 MDA 2022 |

Appeal from the Decree Entered December 6, 2021
In the Court of Common Pleas of Schuylkill County Orphans' Court at
No(s):  A 63-036-21

BEFORE:   STABILE, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED APRIL 20, 2022**

M.H.B., Jr. ("Father"), appeals from the Decree entered in the Schuylkill County Court of Common Pleas, Orphans' Court division, terminating involuntarily his parental rights to his minor biological daughter, K.L.B (born July 2010).   Herein, Father contends the court erroneously determined termination was in K.L.B.'s best interests despite evidence that a parent-child bond had existed between Father and her during the first five years of her life. After careful review, we affirm.

The orphans' court sets forth both the relevant procedural history and its findings of fact made from evidence introduced at Father's Termination of Rights hearing, as follows:

> Mother and Father were never married and began their relationship in 2006 or 2007.  They were in high school when

---

[*] Former Justice specially assigned to the Superior Court.

K.L.B. was born in 2010, and [they] graduated in 2011. They sometimes resided together with Father's grandmother before and after the child was born. When they lived apart, Mother would move back in with her parents or get her own place. When they were not living together, Father would see K.L.B. on a regular basis. The couple permanently separated in 2015.

There were incidents of verbal abuse and physical abuse in the last few years prior to the break-up. Father threw Mother down a flight of stairs and threw a brick through her car window while K.L.B. was in the car. The minor child witnessed many of the abusive actions by Father. Mother never filed for a Protection from Abuse order or had Father arrested.

Mother began her relationship with her current husband in July 2015, and they moved in together in January of 2016.

Father worked at a distribution center from January 2021, until his incarceration in April 2021. Prior to that, he worked "under the table" at a farm close to his home. Father was incarcerated in April 2021, for simple assault on his grandmother and possession of drug paraphernalia. His drug of choice was methamphetamine. During his incarceration, Father claimed he did not participate in any programs due to COVID restrictions on scheduling. He was recently released to White Deer Run for drug rehabilitation. While Father has been at White Deer Run, [for] approximately thirty days, he has attended every "roll-call group" and the HUGS program which [Father describes as] a "parenting/family thing." Father will be moved to a halfway house somewhere in eastern Pennsylvania in the future.

. . .

Father's last contact with K.L.B. was in July 2016. . . . [Since that time,] Father [has] paid no child support. He [has] sent no cards and no birthday or holiday gifts. He has never called Mother, even though her number has not changed since 2016, nor has Father ever contacted her through social media.

Father contested the termination [of his parental rights] because he was there when K.L.B. was born, when she said her first words, took her first steps and had her first bath. . . . He blamed Mother for his not seeing his daughter because they had their "differences." His other reasons for having no contact with his

daughter were that his mother passed away; that Mother stopped answering his texts; that Mother got into a new relationship; that he was often financially unstable; and that he only reached out to Mother when things were "more stable for him."

. . .

There is little evidence that Father performed parental duties. It has been about [five] and a half years since he last saw K.L.B. There may have been regular visits in the beginning when Mother and Father had an "on again, off again" relationship, but there is no evidence of the performance of paternal [duties] since 2016, and certainly not in the six months preceding the filing of the petition to terminate his parental rights. Despite his being incarcerated a month before the petition was filed, the evidence presented supports the termination of his parental rights.

Father failed to put forth a good faith interest and effort to maintain the parent-child relationship. There was no contact and he paid no child support despite claiming to work steadily and earn a good living.

We have consistently held that being a parent is more than a passive state and requires that a parent take an active role. Father did nothing to take on any parental duties and instead blamed others and events in his life for his failure to maintain a relationship with his daughter. His own testimony was that he hoped one day that K.L.B. would "come around."

. . .

K.L.B. has resided with Mother her entire life, and with Mother's husband for about six of her eleven years of life. The family has a good relationship, and they ensure that [K.L.B.'s] physical, emotional, spiritual, and developmental needs are met. K.L.B. is being cared for in a safe environment and has a sense of stability and permanency with her current family after all this time.

There is no evidence that K.L.B. has any bond with Father or that there would be any harm to the child by terminating the parental rights of Father. She has not seen him since July of 2016.

Orphans' Court Opinion, 12/6/21, at 2-3, 5-6, 7.

- 3 -

Consistent with its findings of fact and conclusions of law, the orphans'

court issued an order terminating all parental rights of Father with respect to

K.L.B. The order further awarded custody of K.L.B. to Mother and her husband

("Stepfather"), and it directed that Stepfather's adoption of K.L.B. shall

proceed without further consent of or notice to Father. Father timely

appealed.

Father raises the following issue for our consideration (verbatim):

> Was the evidence sufficient to establish a ground to terminate
> [Father's] parental right and to establish that termination is in the
> best interest of the child?

Brief for Father, at 3.

Termination of parental rights is governed by Section 2511 of the

Adoption Act,[1] which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party
> seeking termination must prove by clear and convincing evidence
> that the parent's conduct satisfies the statutory grounds for
> termination delineated in section 2511(a). Only if the court
> determines that the parent's conduct warrants termination of his
> or her parental rights does the court engage in the second part of
> the analysis pursuant to section 2511(b): determination of the
> needs and welfare of the child[.]

*In re C.M.K.*, 203 A.3d 258, 261-262 (Pa. Super. 2019) (citation omitted).

Clear and convincing evidence is evidence that is so "clear, direct,

weighty and convincing as to enable the trier of fact to come to a clear

conviction, without hesitance, of the truth of the precise facts in issue." *In re*

---

[1] 23 Pa.C.S. § 2511.

*C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting **Matter of Adoption Charles E.D.M., II**, 708 A.2d 88, 91 (Pa. 1998)).  We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm.  **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Instantly, Father apparently concedes to the orphans' court's conclusion that grounds for termination existed pursuant to Section 2511(a)(1), as both his Pa.R.A.P. 1925(b) Concise Statement and the Statement of Questions Involved and the Argument sections of his brief confine his challenge to Section 2511(b).  We thus conclude that Father has waived a challenge with regard to Section 2511(a)(1).  **See In re M.Z.T.M.W.**, 163 A.3d 462, 466 (Pa. Super. 2006) (concluding that the appellant waived challenges regarding, *inter alia*, Section 2511(a) by not including the claim in her statement of questions presented and in failing to develop an argument).

As noted *supra*, the focus under Section 2511(b) shifts to the child.  **See In re Adoption of C.L.G.**, 956 A.2d 999, 1008 (Pa. Super 2008) (*en banc*).  Subsection 2511(b) provides, as follows:

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein

which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

Fundamental to the section 2511(b) inquiry is the consideration of how terminating parental rights would affect the needs and welfare of a child. In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). *See also In re Adoption of C.L.G.*, 956 A.2d at 1007 ("It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely."); *accord In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.").

Central to the court's assessment of a parent-child bond is whether involuntarily terminating parental rights "would destroy an existing, necessary and beneficial relationship" for the child. *In re Adoption of T.B.B.*, *supra*; *see also In re K.K.R.–S.*, 958 A.2d 529, 535 (Pa. Super. 2008). However,

in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of any bond analysis necessarily depends on the circumstances of the particular case. *Id.* at 63.

A parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights, *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010), nor is the mere existence of a child's affection for a parent or capacity to forgive a parent despite parent's neglect determinative of the bond assessment. *In re: T.S.M.*, 71 A.3d at 267. Instead, the inquiry looks to whether a bond, if any, is conducive to the child's mental and emotional health:

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. ... Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.–S.*, 958 A.2d at 535 (internal citations and quotation marks omitted). *See also In re K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests); *In re B.,*

***N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004) (stating that, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment").

In the case *sub judice*, there is competent evidence in the record to support the orphans' court's Section 2511(b) finding of no parental bond and no detriment to K.L.B. in involuntarily terminating Father's parental rights. Father abandoned then-six year-old K.L.B. in July 2016, and neither he nor his family made any attempt to contact or support her in the ensuing five and one-half years. K.L.B. remembers Father, but she expresses no desire to see him, and she views Stepfather as her father and has called him "Dad" for years. N.T., 9/15/21, at 10, 14.

Mother's undisputed evidence in this regard established that the responsibility to provide for the safety, care, and well-being of K.L.B. has fallen exclusively upon Mother and Stepfather during Father's voluntary, unforced abdication of such duties, and K.L.B. has thrived under their parenting. ***Id***. Stepfather has initiated the process to formally adopt K.L.B. after the termination of Father's rights, and Mother denied there would be any value to K.L.B. in allowing Father to restart a relationship with her. N.T. at 11, 16.

Father's argument essentially states that it is in K.L.B.'s best interests that he be permitted to resume a parental relationship with her because he was in her life for her first five years as her natural father. N.T. 10/7/21, at

14, 18. However, as discussed *supra*, a child's life cannot be placed on hold for years until a parent perhaps acquires the necessary parenting skills required to provide a caring and safe environment[2] or until he commits to renewing a parent-child bond with her that has been lost through his voluntary, unforced abandonment of her.

Clear and convincing evidence thus revealed a lost bond between K.L.B. and Father because of Father's decision to remove himself completely from her life so long ago. The orphans' court found that this long-term abdication and the consequential dissolution of any parent-child bond provided grounds to conclude that involuntary termination of Father's parental rights would best serve K.L.B.'s needs and welfare. In addition, the orphans' court gave considerable weight to the fact that Stepfather, who has started the process necessary to adopt K.L.B., has been financially and emotionally supporting her for the past six years and, as a result, has established a strong and consistent bond with her. ***See In re K.M.***, 53 A.3d at 791 ("[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child"). Therefore, we deem meritless Father's challenge to the court's Section 2511(b) assessment.

Accordingly, as we discern no error with the orphans' court's termination of Father's parental rights, we affirm the decree entered below.

_____

[2] Appropriately considered in the orphans' court's Section 2511(b) discussion regarding the provision of a caring and safe environment is Father's continued substance abuse and violent behavior, as evidenced by his April 2021 criminal conviction for assaulting his grandmother.

Decree Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/20/2022